IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

UNITED STATES OF AMERICA

v.                                        Criminal No. 3:00cr72

ERSKINE LARUE HARTWELL

### MEMORANDUM OPINION

This matter is before the Court on the DEFENDANT'S REPLACEMENT RENEWED MOTION FOR COMPASSIONATE RELEASE PURSUANT TO SECTION 603(b) OF THE FIRST STEP ACT (ECF No. 156) (the "REPLACEMENT"), the Government's Response in Opposition to Defendant's Replacement Renewed Motion for Compassionate Release (ECF No. 161), and the DEFENDANT'S REPLY TO THE GOVERNMENT'S RESPONSE TO HIS REPLACEMENT RENEWED MOTION FOR COMPASSIONATE RELEASE (ECF No. 162) and three supplements to the REPLACEMENT (ECF Nos. 163, 164, and 165). For the reasons set forth below, the DEFENDANT'S REPLACEMENT RENEWED MOTION FOR COMPASSIONATE RELEASE PURSUANT TO SECTION 603(b) OF THE FIRST STEP ACT (ECF No. 156) will be denied.

### STATEMENT OF FACTS

On April 27, 2000, Erskine L. Hartwell pled guilty to a one count Criminal Information charging him with conspiring to commit murder for hire in violation of 18 U.S.C. § 1958(a). The offense conduct is reflected in the Statement of Facts accompanying the

Plea Agreement which is replicated in the Presentence Report ("PSR") (ECF No. 114, ¶ 12).

The factual predicate for Hartwell's conviction began on December 16, 1998, when a grand jury in Greenbelt, Maryland indicted Basem Najjar on federal racketeering and related offenses. Hartwell was a close associate of Najjar. When Najjar learned that James Lee a/k/a "Jimmy Lee" was a Government informant who had cooperated with the Government, Najjar issued a contract worth $50,000 for Lee's murder. (PSR, ¶ 12)

Lee operated Lee's Auto Body Shop in Colonial Beach, Virginia and lived two houses away from the body shop. The residence of William Payne Griffith was located between the body shop and Lee's house. Jaime Pereira worked at Lee's Auto Body Shop. Id.

Kevin Gray was another associate of Najjar. Gray, Najjar, and Hartwell met with each other in Maryland in January 1999. By that time, Gray had accepted the $50,000 contract to kill Lee, but had subcontracted the murder to a hit man, Oscal Veal, Jr. At the January 1999 meeting, Najjar and Gray requested Hartwell to assist in the plot to kill to Lee by identifying Lee to Veal so that he could kill Lee.

In furtherance of the charged conspiracy, and not long after the meeting in January 1999, Veal and Hartwell drove to Lee's Auto Body Shop where they conducted surveillance on the location so

2

that Hartwell could identify Lee for Veal.  However, they did not, on that mission, see Lee at the body shop.  At the time, Hartwell and Veal also believed that Lee lived next door to the body shop.  Id.  Not long thereafter, Hartwell learned from Najjar that Lee did not live in that location.  Hartwell then informed Veal that Lee instead lived in the house next door to the body shop.  That information was erroneous because William Payne Griffith lived in that house.  Id.

On March 2, 1999, Veal drove to Lee's Body Shop so that he could fulfill the contract and kill Lee.  Instead, Veal shot Jaime Pereira to death, thinking that Pereira was Lee.  Veal immediately realized that he had killed the wrong person so he went next door where he wrongly believed that Lee lived.  Veal knocked on the door, Griffith answered from inside, and Veal opened fire. However, he did not hit Griffith.  Id.

The record reflects that this was not Hartwell's first involvement in murderous activities.  As shown in the PSR, Hartwell was involved in such activity in 1994, 1996, and 1998.  (PSR, ECF No. 114, ¶¶ 38a-e) In November 1994, Hartwell aided and abetted in a drug-related murder by informing the killer that he (Hartwell) would provide the killer with drugs or money after the murder.  Id. at ¶ 38e.  In March 1996, Hartwell shot and killed a man because he believed that the man had been romantically involved

3

with Hartwell's girlfriend. Id. at ¶ 38d. In July 1996, Hartwell aided and abetted Veal in the attempt to kill another man who was, at the time, fleeing from Veal. Id. at ¶ 38c. In January 1998, Hartwell aided and abetted a murder in Washington, D.C. Id. at ¶ 38b. In December 1998, Hartwell aided and abetted in an assault with the intent to kill a witness to a murder that had been committed by the principal whom Hartwell aided. Id. at ¶ 38a.

To understand Hartwell's motion, the Government's position, and an important factor in resolving one of Hartwell's theories, it is necessary to understand Hartwell's involvement in an entirely different case. In May 1999, not long after the murder of Pereira at Lee's Auto Body Shop and the attempt to kill Lee at Griffith's residence, Hartwell was arrested in Maryland on federal charges arising out of a drug trafficking and money laundering conspiracy. (PSR, ECF No. 114, ¶ 34) Thereafter, Hartwell pleaded guilty in the District of Maryland to several drug distribution charges and a money laundering conspiracy charge. He was sentenced in January 2002 to 360 months imprisonment.[1]

_____

[1] In April 2003, the United States District court for District of Maryland reduced that sentence to 240 months imprisonment. Then, in 2009, the sentence was further reduced to 188 months because of a retroactive amendment to the guidelines.

In February 2000, before pleading guilty in the Maryland case, Hartwell was charged by a Criminal Information with murder for hire in this case. As part of his plea agreement in this case, Hartwell agreed to cooperate fully, completely and truthfully with the Government. In return, the Government agreed not to seek the death penalty for the murder of Pereira, not to further prosecute Hartwell in the Eastern District of Virginia for the conduct described in the Criminal Information or the Statement of Facts, and to recommend that the sentence in this case be run concurrently with the sentence that was to be imposed in the District of Maryland. In August 2000, Hartwell was sentenced in this case to the statutory mandatory minimum term of life imprisonment to run concurrently to the sentence that was to be imposed by the District of Maryland.

In the REPLACEMENT, Hartwell emphasized that he had entered the plea in this case believing that his cooperation with the Government would be sufficient to warrant a motion for sentence reduction under Fed. R. Crim. P. 35 (ECF No. 156, p. 2). To that end, Hartwell began to provide information and testimony in several criminal investigations and trials. However, the Government became "concern[ed] about the completeness and truthfulness of [Hartwell's] cooperation following his testimony during the trial of ones James McGill in the District of Maryland." United States

5

v. Hartwell, 448 F.3d 707, 710 (4th Cir. 2006).  In particular, "Hartwell told two FBI agents that he had committed perjury [in the McGill trial] at the urging of an Assisitant United States Attorney."  Id.  Subsequently, Hartwell told the Assistant United States Attorney that he had "lied to the FBI agents  because he was angry at some of the law enforcement officers involved in the case," and that he had not really perjured himself during the McGill trial.  Id.  In addition, the Government learned that Hartwell had "withheld information from DEA agents about homicides in which he had been involved."  Id. at 710-11.

When the Government learned of those facts, it advised Hartwell's counsel that, even though Hartwell had violated his obligation to cooperate fully, completely and truthfully under the plea agreement, he would still be allowed to continue to cooperate in order to earn a sentence reduction in this case.  Id. at 711. And so it was that, in August 2001, the Government filed a motion for reduction of Hartwell's sentence under Fed. R. Crim. P. 35 so as to toll the one year statute of limitations.  The Government asked the Court to delay the ruling until Hartwell had fulfilled his cooperation.  In that motion the Government recommended a sentence reduction to 38 years (465 months) of imprisonment.

However, in June 2003, Hartwell alleged that the Government had breached the plea agreement, and in support thereof, Hartwell

offered his affidavit asserting that an Assistant United States Attorney had promised to reduce his sentence to 18 years in a Rule 35 motion. At that point, the Government moved to withdraw the Rule 35 motion. The Government's request to withdraw that motion was granted by the district court and affirmed by the Fourth Circuit. Id. at 718-20.

Hartwell filed two previous compassionate release motions (ECF Nos. 125 and 126-1). Both were denied for failure to exhaust administrative remedies but without prejudice to the filing of a proper motion as to which the remedies had been exhausted. Hartwell then filed a renewed motion (ECF No. 147). Because Hartwell's motion was difficult to understand and the response of the United States did not really address some of Hartwell's arguments, Hartwell was afforded leave to file a replacement renewed motion and the Government was required to file a response to make sure that the issues were properly joined (Memorandum Opinion, ECF No. 154 and Order, ECF No. 155).

The REPLACEMENT (ECF No. 156) was then filed. In it, Hartwell asserts five grounds for compassionate relief: (1) Proportionality — The Punishment Does Not Fit the Crime; (2) Unwarranted Disparities; (3) Federal Sentencing Guidelines; (4) Rehabilitation; and (5) 18 U.S.C. § 3553(a) Factors.

DISCUSSION

The applicable statute, 18 U.S.C. § 3582(c)(1)(A), provides, in pertinent part, that, upon appropriate motion, the Court "may reduce the term of imprisonment . . . if it finds that 'extraordinary and compelling reasons' warrant such a reduction." As the United States Court of Appeals for the Fourth Circuit recently explained:

> Congress authorized 'compassionate release' in 18 U.S.C.§ 3582(c)(1)(A). That provision begins with the general rule that a 'court may not modify a term of imprisonment once it has been imposed.' Id. It then describes an exception to that rule, in which courts may consider motions made by defendants who have exhausted their administrative remedies and are seeking a sentence modification. Id.; see also United States v. Betheau, 54 F.4th 826, 831 (4th Cir. 2022). A court can grant a compassionate release motion if it finds that (1) 'extraordinary and compelling reasons warrant such a reduction,' (2) 'that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission' and (3) that the § 3553(a) factors weigh in favor of granting relief, 'to the extent that they are applicable.' See § 3582(c)(1)-(2).
>
> Elements one and two are supposed to work together. Because '[§]3582(c)(1)(A)(i) does not attempt to define the "extraordinary and compelling reasons" that might merit compassionate release,' the 'Sentencing Commission, pursuant to authority granted it by Congress,' does so instead. McCoy, 981 F.3d at 276 (quoting § 3582(c)(1)(A)(i)). But that only works when there is an applicable policy statement. . . . Without a policy statement applicable to compassionate release motions made by defendants, the district court had discretion to make its 'own independent determination of what constitutes an extraordinary

8

and compelling reason under § 3582(c)(1)(A). . . .' <u>Id.</u> at 284 (cleaned up).

>    If a district court finds extraordinary and compelling circumstances warrant a sentence reduction, it must then consider whether the factors in § 3553(a) support such a decrease. The § 3553(a) factors include 'the nature and circumstances of the offense' as well as the defendant's history and characteristics, the 'kinds of sentences available,' and 'the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(1), (3), (6). They also include the need for the sentence 'to reflect the seriousness of the offense, to promote respect for the law, . . . to provide just punishment for the offense,' to deter criminal conduct, to protect the public and to provide the defendant with appropriate resources such as 'medical care' and 'vocational training.' <u>Id.</u> § 3553(a)(1). But district courts are only required to address the § 3553(a) factors 'to the extent that they are applicable.' § 3553(a).

<u>United States v. Burleigh</u>, 145 4th 541, 547-48 (4th Cir. 2025).

In <u>United States v. Troy</u>, 64 F.4th 177 (4th Cir. 2023), the Fourth Circuit clarified the procedure to be followed by district courts when considering motions for compassionate release. Citing <u>Concepcion v. United States</u>, 597 U.S. 481, 142 S.Ct. 2389 (2022), the Fourth Circuit instructed that:

>    <u>Concepcion</u> instructs district courts exercising their discretion under the First Step Act to proceed in two steps. First, they must recalculate the movant's Guidelines range "only to the extent it adjusts for the Fair Sentencing Act." <u>United States v. Shields</u>, 48 F.4th 182, 192 (3rd Cir. 2022) <i>see also</i> <u>Concepcion</u>, 142 S.Ct. at 2402 n.6,

9

2043 n.8. Second, they may (and when raised by the parties, must) consider other legal and factual changes when deciding whether to impose a reduced sentence. <u>Concepcion</u>, 142 S.Ct. at 2396, 2402 n.6.

<u>United States v. Troy,</u> 64 F.4th at 184. At sentencing, the Guidelines Base Offense Level was 43, the Adjusted Offense Level was 41, the Total Offense Level was 38. Hartwell's Criminal History Category was III. This produced a Guideline imprisonment range of 292 to 365 months. Worksheet (ECF No. 49, n.2). That range, however, was restricted by the statutorily set mandatory life imprisonment. The statutory penalty and the Guideline range are the same today. Worksheet in Response to Motion for Compassionate Release (ECF No. 149).

That brings the analysis to the several theories upon which the REPLACEMENT rests its argument that there exist extraordinary and compelling circumstances that warrant compassionate release. Each will be considered in turn.

## 1.    Proportionality

Hartwell argues that the sentence for "simply pointing out the target of the murder for hire" is excessive, especially considering that he pled guilty, accepted responsibility and attempted to cooperate with the Government.  In further support of this contention, Hartwell notes that: (1) he was charged only with aiding and abetting; (2) he was given a minor role adjustment;

and (3) the Presentence Report concluded that his involvement was not necessary to commit the crime. And he follows those arguments with the assertion that his sentence is "'substantially longer than the average sentence imposed for far more serious' and 'violent' criminal conduct." (ECF No. 156, pp. 12-13).

The Government's response to the proportionality contention is that it is not a ground for compassionate relief that is permitted by U.S.S.G. § 1B1.13(b)(6)—the "unusually long sentence provision." That section provides:

> If a defendant received an <u>unusually long sentence</u> and has <u>served at least 10 years</u> of the term of imprisonment, <u>a change in the law</u> (other than an amendment to the Guidelines Manual that has not been made retroactive) <u>may be considered</u> in <u>determining</u> whether the defendant presents an <u>extraordinary and compelling reason</u>, <u>but only</u> where such change would <u>produce a gross disparity</u> between the sentence being <u>served</u> and the sentence <u>likely to be imposed</u> at the time the motion is filed, <u>and</u> after full consideration of the defendant's <u>individualized</u> circumstances.

U.S.S.G. § 1B1.13(b)(6). The United States first responds that this section does not apply because Hartwell has not identified any change in the law. And, it is correct that Congress has not changed the penalty for murder for hire resulting in death since the date that Hartwell's sentence was imposed in this case. That, says the Government, establishes that there is no gross disparity between the sentence being served and the sentence likely to be imposed at the time the motion [for compassionate release] is

filed. The final facet of this argument by the United States is that Hartwell does not satisfy the final requirement of § 1B1.13(b)(6) which, in addition to requiring a change in the law that would produce a gross disparity between the sentence being served and the sentence likely to be imposed at the time the motion [for compassionate release] is filed, also requires that the decision on compassionate release be made "after full consideration of the defendant's individualized circumstances."

In reply, Hartwell says that the Government's argument "failed [to] acknowledge that the newly amended sentencing guidelines, which went into effect on November 1, 2023, includes a catchall provision, 'Other Reasons.'" U.S.S.G. § 1B1.13(b)(5) provides that a court may find extraordinary and compelling reason for relief if the "defendant presents any other circumstance or combination of circumstances that, when considered by themselves or together with any of the reasons described in paragraphs (1) through (4), are similar in gravity to those described in paragraphs (1) through (4)."

The United States is correct that Hartwell's motion does not fit within the requirements of the unusually long sentence provision (§1B1.13(b)(6)) because he identifies no change in the law and because there is no difference between the imposed sentence and the sentence that would be imposed today. But Hartwell is

correct that the Court must consider the current version of the policy statement and so the initial inquiry is whether Hartwell's proportionality theory fits within the current policy statement.

The current policy statement (§ 1B1.13) provides as follows:

> (b)  EXTRAORDINARY    AND    COMPELLING    REASONS.—
> Extraordinary and compelling reasons exist under any of the following circumstances or a combination thereof:
>
>    (1)  MEDICAL CONDITIONS OF THE DEFENDANT.
>
>    (2)  AGE OF THE DEFENDANT.
>
>    (3)  FAMILY CIRCUMSTANCES OF THE DEFENDANT.
>
>    (4)  VICTIM OF ABUSE.
>
>    (5)  OTHER REASONS.—The defendant presents any other circumstance or combination of circumstances that, when considered by themselves or together with any of the reasons described in paragraphs (1) through (4), are similar in gravity to those described in paragraphs (1) through (4).
>
>    (6)  UNUSUALLY LONG SENTENCE.

As the matter has sorted out in the briefing, Hartwell's proportionality argument relies on U.S.S.G. § 1B1.13(b)(5), the "OTHER REASONS" provision. (ECF No. 162, p. 5). Then, citing _United States v. McCoy_, 981 F.3d 271 (4th Cir. 2020), Hartwell asserts that the "Court should 'consider any extraordinary and compelling reason for release' raised by Mr. Hartwell." (ECF No. 162, pp. 5-6 (citing _United States v. McCoy_, 981 F.3d at 284)).

13

That, however, is not what McCoy instructs.    Instead, McCoy actually held that:

> In short, we agree with the Second Circuit and the emerging consensus in the district courts: There is as of now no 'applicable' policy statement governing compassionate-release motions filed by defendants under the recently amended § 3582(c)(1)(A), and as a result, district courts are 'empowered . . . to consider *any* extraordinary and compelling reason for release that a defendant might raise.' *Zullo*, 976 F.3d at 230.

United States v. McCoy, 981 F.3d at 284 (emphasis added).

McCoy was decided in 2020.    As Hartwell himself points out, the policy statement here involved (§ 1B1.13) was issued in 2023 and does address compassionate release.    (ECF No. 162, p. 5).    And, contrary to Hartwell's assertion, McCoy does not untether a determination of extraordinary and compelling circumstances from a guideline policy statement that actually addresses and, indeed, provides instruction on, that very subject.

Moreover, where, as here, a motion for compassionate release is linked by the defendant to a particular policy statement (here § 1B1.13(b)(5)), the defendant cannot be heard to say that McCoy allows a court to disregard the express terms of the policy statement.

So, to succeed Hartwell must prove that the nature of the offense of conviction and the length of the sentence imposed, taken together, are similar in gravity to the circumstances described in

14

subsections (1) through (4). His attempt to do that turns on the contention that the sentence is not proportional to his "offense conduct." (ECF No. 162, p. 12). But that characterization is at odds with the premise of his argument that it is the crime to which the sentence must be proportional, not just offense conduct.

Murder for hire is among the most reprehensible of crimes. Congress recognized the seriousness of the crime by prescribing a mandatory life sentence. Hartwell's conduct helped the commission of that crime and the result is a dead man.

Apparently recognizing the seriousness of the crime of which he was convicted, Hartwell suggests that somehow the crime is less serious because: (1) he only aided and abetted in its commission ("pointing out the target of the murder for hire"), (ECF No. 162, p. 12); (2) he was accorded a minor role adjustment in the PSR; Id. and (3) the PSR observed that "his involvement was not necessary to commit the crime." Id. It is correct that those points were in the PSR to which no objection was taken. Those three points are merely another way of saying that Hartwell "aided and abetted the crime of murder for hire." But being an aider and abettor does not in any way lessen the egregious nature of the crime itself. Under federal law an aider and abettor is responsible as a principal, and Hartwell's culpability is treated no differently than that of the principal. Rosewood v. United

15

States, 572 U.S. 65, 70 (2014); United States v. Kimble, 855 F.3d 604, 613 (4th Cir. 2017). That fundamental precept is not changed because Hartwell did less to commit the crime than did Veal, the shooter. That fundamental precept also shows why proportionality measures the sentence by the crime of conviction, not just the offense conduct. That precept does not preclude consideration of the defendant's offense conduct, but neither does it confine that analysis to the offense conduct.

Moreover, assessing whether the punishment fits the crime ("proportionality" as Hartwell would have it) cannot be divorced from the criminal who committed that crime. And that is not just an exercise in calculating criminal history because, in assessing whether a circumstance is extraordinary, it is necessary to know whether it has happened before and, if so, whether those circumstances are like the circumstances of the offense of conviction. On this record, that aspect of the extraordinary assessment shows that Hartwell has been involved on several occasions in similar conduct, and in one instance, in virtually identical conduct. That teaches that, at least for Hartwell, the circumstances are not extraordinary.

As mentioned previously, Hartwell takes the view that his sentence is longer than the average sentence imposed for far more serious and violent criminal conduct. (ECF No. 156 at 13)

16

("quoting <u>United States v. Brown</u>, 78 F.4th 122, 131 (4th Cir. 2023)).  However, in <u>Brown</u>, the comparison to sentences for murder and kidnapping were used to illustrate the length of firearm offenses under § 924(c).  The crime involved here is murder for hire that resulted in death.  And, in any event, Congress has prescribed a mandatory minimum term of life imprisonment for murder for hire resulting in death so comparison to an average sentence for that crime with other crimes is not particularly helpful. Moreover, the Fourth Circuit advises care in reliance upon sentencing statistics.  <u>United States v. Sueiro</u>, 59 F.4th 132, 142 n.3 (4th Cir. 2023); <u>United States v. Abed</u>, 3 F.4th 114, 117 (4th Cir. 2021).

Much of the law addressing the concept of proportionality appears in cases involving an Eighth Amendment challenge to the sentence. <u>United Stats v. Cobler</u>, 748 F.3d 570 (4th Cir. 2014). Neither party makes an Eighth Amendment argument here. But it is useful to examine the precepts that guide a proportionality argument in the context of an Eighth Amendment challenge. As the Fourth Circuit explained in <u>Cobler</u>:

> The Supreme Court has emphasized the limited scope of both types of proportionality challenges. In the context of an as-applied challenge, the Court has explained that the 'narrow proportionality principle' of the Eighth Amendment 'does not require strict proportionality between crime and sentence,' but 'forbids only extreme sentences that are grossly disproportionate to the crime.'

> Graham, 560 U.S. at 59-60 (quoting Harmelin v.
> Michigan, 501 U.S. 957, 997, 1000-01, 111 S. Ct.
> 2680, 115 L. Ed. 2d 836 (1991) (Kennedy, J.,
> concurring)) (internal quotation marks omitted).
> Before an appellate court concludes that a
> sentence is grossly disproportionate based on an
> as-applied challenge, the court first must
> determine that a 'threshold comparison' of the
> gravity of the offense and the severity of the
> sentence 'leads to an inference of gross dispro-
> portionality.' Id. (quoting Harmelin, 501 U.S. at
> 1005 (Kennedy, J., concurring)) (brackets
> omitted). In the 'rare case' that a reviewing
> court concludes that such an inference may be
> drawn, the court is required to compare the
> defendant's sentence: (1) to sentences for other
> offenses in the same jurisdiction; and (2) to
> sentences for similar offenses in other
> jurisdictions. Id. If this extended analysis
> validates the threshold determination that the
> sentence is grossly disproportionate, the sentence
> is deemed 'cruel and unusual' punishment under the
> Eighth Amendment. Id.

United States v. Cobler, 748 F.3d at 574. Because there is no

Eighth Amendment argument in Hartwell's REPLACEMENT, that

formulation is neither presented by him nor addressed by the

Government. Considering the grievous nature of the crime of murder

for hire, and by the societal judgment reflected in the

Congressionally imposed mandatory life sentences, the Court cannot

cross the threshold requirement that a "comparison of the gravity

of the offense and the severity of the sentence leads to an

inference of gross disproportionality." United States v. Cobler,

748 F.3d at 574 (quoting Harmelin v. Michigan, 501 U.S. at 1005).

So, even if the Eighth Amendment proportionality framework

18

discussed in Cobler applied to Hartwell's proportionality argument, Hartwell could not succeed because the severity of sentence considered in perspective of the gravity of the offense does not "lead to an inference of gross disproportionality." Id.

## 2.    Unwarranted Disparities

Hartwell bases his disparity argument largely upon the sentence of Veal, who was involved in the murder for hire scheme in this case, but was neither tried nor sentenced for that murder for hire.  Instead, Veal was sentenced in another case in another court on other charges.  Veal, the shooter in this case, was sentenced to 25 years imprisonment in a case in the United States District Court for the District of Columbia for a RICO conspiracy and a different murder in the aid of racketeering.  The record establishes that Veal's sentence was largely the result of cooperation with the Government.  Nothing in the record shows that Veal minimized his involvement or gave inconsistent accounts of his criminal acts. Also, the Government advises that Veal provided the most significant break in the Government's case in another district which, in the end, led to the conviction of defendants charged with 31 separate murders and 12 attempted murders.  (ECF No. 161, pp. 18-20).

As the United States points out, Hartwell's circumstances certainly do not fit that mold.  Specifically, although Hartwell

19

originally provided information and testimony in other criminal investigations and trials, he breached the plea agreement's obligations to testify completely and truthfully. In particular, he informed two FBI agents that he had committed perjury at the urging of a particular Assistant United States Attorney in a trial in the District of Maryland and then told the Assistant United States Attorney that he had lied to the FBI agents because he was angry at some of the law enforcement officers involved in the case and then said that he had not perjured himself during the trial in Maryland. In addition, the Government found that Hartwell had withheld information from DEA agents about homicides in which he was involved. Notwithstanding those difficulties, the Government permitted Hartwell to continue to cooperate so as to obtain a sentence reduction.

Instead of satisfying those requirements, Hartwell charged falsely that the Government had breached its plea agreement because an Assistant United States Attorney had promised him a reduce sentence of 18 years. United States v. Hartwell, 448 F.3d at 710; ECF No. 116 at 20. Over Hartwell's challenge to the Government's motion to withdraw the Rule 35 motion, the motion was granted and the Fourth Circuit affirmed that decision, holding that "the Government acted well within its discretion in deciding that Hartwell no longer was satisfactorily fulfilling his plea-

agreement obligations." <u>United States v. Hartwell</u>, 448 F.3d at 719. Accordingly, there is no real basis for comparing Veal's circumstances in the District of Columbia's case and Hartwell's in this case. Nor is there any basis to use as comparators other co-conspirators in the District of Columbia or Maryland cases because their crimes and sentences were based on the facts of those cases which were not comparable to those in Hartwell's case. For example, Hartwell points to: (1) Omar Wazir whose charges of conspiracy to distribute and possess cocaine was dismissed based on cooperation; (2) Frank Howard who was sentenced to eight years in prison on a RICO conspiracy charge; (3) Derrick Moore and Roy Johnson who received sentences of 150 months on charges of RICO conspiracy and a continuing criminal enterprise; (4) Jerome Vick who was charged with a RICO conspiracy and whose unstated sentence was some time later reduced to time-served; (5) five or six other defendants in the District of Columbia case whose sentences of 54 months, 120 months or whose cases were dismissed for reasons neither stated nor readily apparent. None of the putative comparators were convicted of murder for hire so their sentences for lesser crimes prove nothing to help Hartwell's disparity theory.

### 3.    Federal Sentencing Guidelines

Hartwell also argues that extraordinary and compelling circumstances exist because the sentencing guidelines "reflect a measure of punishment far below the mandatory minimum sentence of life." (ECF No. 156, p. 17) In particular, Hartwell says that using the applicable federal sentencing guideline, U.S.S.G. § 2E1.4 which makes reference to the murder guidelines in U.S.S.G. § 2A1.1, Hartwell's guideline range would have been 292 to 365 months. (ECF No. 156, p. 18; PSR, ECF. No. 114, ¶ 83)

As the United States correctly notes, this theory of compassionate release finds no support in Guideline § 1B1.13. Further, Hartwell cited no authority for the proposition that the guideline range that would apply absent a statutory mandatory minimum is an extraordinary and compelling circumstance warranting compassionate release. The Government reported that it could find no such cases. The Court could not find none either.

At bottom, this theory is based upon the notion that the Government should have charged Hartwell with some other offense and, if that had happened, he would have been subjected to a penalty other than the mandatory minimum sentence of life imprisonment for murder for hire. Again, Hartwell cites no authority that such an analysis is appropriate in conducting the review of a motion for compassionate release. And, as the United

22

States correctly points out, the Government has a broad discretion to conduct criminal prosecutions which includes the authority to select the charges that are to be brought in particular cases. (ECF No. 161, p. 22, citing Ball v. United States, 470 U.S. 856, 859 (1985)). The Government exercised that authority in this case and it is not for the Court to second guess that judgment.

Hartwell also argues that he has already served a term of imprisonment exceeding the low end (292 months) of the Guidelines. Although the length of time already served can be considered in making the § 3553(a) analysis (if the analysis gets to that point), it is difficult to understand how that issue fits into the federal sentencing guidelines argument made by Hartwell. However, it is appropriate to remember that, before the Government withdrew the Rule 35 motion, the Government had recommended a sentence of 38 years, or 456 months, imprisonment, not a sentence within the guideline range (292 to 365 months).

## 4. Rehabilitation

Hartwell correctly argues that post-sentence rehabilitation is a factor that can be considered in assessing whether extraordinary and compelling reasons warrant compassionate relief. On that score, Hartwell contends that he "has been a model prisoner, with significant [BOP] programming and steady prison employment throughout his over 24 years of federal time." He also

23

completed his GED in 2004 and several other programs (they are reflected in Exhibits A and B to ECF No. 156 and Exhibit B to ECF No. 125, an earlier now dismissed motion). Also, Hartwell notes that he has been categorized has a low recidivism risk under the prisoner assessment tool targeting estimated risks and needs (pattern). All of that seems to be undisputed, except the "model prisoner" assertion.

Of course, "[r]ehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason." 28 U.S.C. § 994(t). U.S.S.G. § 1B1.13(d) and decisional law say the same. See e.g. United States v. Peoples, 41 F.4th 837, 842 (7th Cir. 2022). But it is settled that successful rehabilitation efforts can be considered as among other factors under § 3582(c)(1)(A)(i), McCoy, 981 F.3d at 286, n.29, as well as the amended policy statements § 1B1.3(d).

The Government, for its part, acknowledges that Hartwell's course work and work responsibilities are positive measures but correctly argues that self-improvement while in prison is the rule not the exception. (ECF No. 161, p. 24). And, indeed, Hartwell is to be commended for using his time in prison productively.

However, Hartwell is in error in claiming to be a model prisoner (ECF No. 156, p. 19) He does not have a clean disciplinary record in prison. He incurred violations in 2010, 2016, 2020, and

2024.  No doubt there are prisoners who do not comport themselves as well as Hartwell in prison but that does not mean that he is a model prisoner.  All told, Hartwell's efforts at rehabilitation, though laudable, do not rise to the level that would warrant compassionate release from the sentence that was imposed for a murder for hire conviction.

Because Hartwell has not established extraordinary and compelling reasons for supporting compassionate release, it is not necessary to conduct the requisite analysis under 18 U.S.C. § 3553(a).  And, ordinarily, it is preferable to articulate to a single basis for decision and, conversely, to refrain from making alternate holdings.  Karsten v. Kaiser Found. Health Plan of the Middle Atlantic States, Inc., 36 F.3d 8, 11 (4th Cir. 1994). However, considering the intensity with which Hartwell has pursued relief under the compassionate release statute, and the consequent likelihood of appeal, this case presents one of those unusual circumstances where it is appropriate to articulate an alternative ground of decision.  Accordingly, it is appropriate to make the analysis under 18 U.S.C. § 3553(a).

## 5.  18 U.S.C. § 3553(a) Factors

Hartwell's view is that the appropriate factors to consider are "the nature and circumstances of the offense, just punishment, seriousness of the offense, promoting respect for the law, and

25

protecting the public from further crimes of the defendant." (ECF No. 156, p. 20) However, Hartwell does not meaningfully address any of those factors.   Instead, he focuses on attempting to miminize his role in the crime. First, he makes the point that "[c]onsidering what a just punishment would be for merely pointing out where the target of the crime lives the day before the shooting occurred should clearly lead the Court to a finding that relief is warranted." Id. Hartwell follows that by asserting that "[b]eing nowhere near the scene of the crime on the day of the shooting should demonstrate to the Court that the goals of deterrence and promoting the public from crimes of the defendant are well served by a sentence of 25 years in federal prison." And to that, he adds the conclusory assertion that "the very substantial rehabilitation demonstrated by Mr. Hartwell and his support in the community further supports release under the § 3553(a) factors." For the reasons that follow, Hartwell's reliance on those precepts do not meet the burden that is required of him.

To begin, the nature and circumstances of the offense are, as Hartwell admits, a critical factor in the § 3553(a) analysis. And, as the United States argues, "[m]urder 'has no comparison "in terms of moral depravity and of the injury to the person" given its "severity and irrevocability"'". (ECF No. 161, p. 26) (citing In re Irby, 858 F.3d, 231, 237 (4th Cir. 2017).  And murder for hire

26

represents an even deeper level of depravity.  Murder for hire to intimidate witnesses strikes at the very heart of the judicial system.  So the nature and circumstances of the offense of conviction in this case, counsels against compassionate release.

The very nature of the crime of conviction here calls for a sentence that promotes respect for the law, protects the public, and deters the defendant and others who would commit that crime.  They are the driving § 3553(a) factors in this case.  The serious nature of the offense is only one aspect of the analysis illustrating the need to protect the public and to deter the defendant.

The history and characteristics of the defendant also cut against compassionate release in this case.  As outlined previously, supra at 3-4, and in ¶ 38 of the PSR (EFF No. 114), Hartwell has a history of engaging in violent behavior involving shooting, murdering, and killing, and, in one previous instance, attempting to kill a witness to keep him from testifying.  Those circumstances, which are reflected in the history and characteristics of the defendant component of § 3553(a)(1), when considered in perspective of the nature of the offense of which Hartwell was convicted, murder for hire, fully warrants Hartwell's removal from society.  Indeed, wholly apart from the fact that Congress made that maximum punishment mandatory, one might

27

reasonably ask how many shootings, killings or intimidation of witnesses are required before continued participation in such activities warrants life imprisonment to deter such conduct, to protect the public from it, and to promote respect for the law. The driving § 3553(a) factors—protection of the public, deterrence, and promoting respect for the law—all counsel strongly that the appropriate sentence was imposed in this case and that compassionate release is not appropriate.

At the end of his motion, Hartwell lists "other factors" that he says support his argument for compassionate release. First, he argues that he did not put the Government to the task of proving its case because he pled guilty early on. That is true but it was taken account of and is not a ground for compassionate release. Second, Hartwell points to a number of letters (ECF Nos. 156, Exhibits C through J) of support from friends and colleagues which he says evince that Hartwell is a changed person. Thirdly, Hartwell argues that, at the age 56, he is no longer "among the age group of individuals to recidivate upon release from prison." (ECF No. 156, p. 23) And he mentions, but does not explain the relevance of, a generally described "troubling" upbringing.

It is to be hoped that the time that Hartwell served in prison has helped in his effort to improve himself from the person he was

28

when he went through the prison doors.   But nothing in those exhibits or those arguments, including the age of recidivism argument, overcomes in any way the fact that, because of the crime of which Hartwell was convicted, a human being is dead or the fact that Hartwell has an extensive history of engaging in like conduct and violence that make him a danger to the public and that warrant the conclusion that imprisonment for the rest of his life is the best way to effect protection of the public, to deter further crime by a defendant who has committed violent (and, indeed, quite similar) crimes on several occasions, as well as others who would consider engaging in murder for hire, and to promote respect for the law.

None of these points changes the analysis that compassionate release is not appropriate.   One would expect that 24 years in prison and the attendant aging of the defendant would help to produce a change.   But, the seriousness of the crime of murder for hire and Hartwell's previous violent conduct counsel in favor of continued incarceration to protect the public, to deter Hartwell and others who would be tempted to commit murder for hire, and to promote respect for the law.

## CONCLUSION

For the foregoing reasons, the DEFENDANT'S REPLACEMENT RENEWED MOTION FOR COMPASSIONATE RELEASE PURSUANT TO SECTION 603(b) OF THE FIRST STEP ACT (ECF No. 156) will be denied.

It is so ORDERED.

_____/s/_____ REP_____

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: September 15, 2025

30